### In re PARQUE FORESTAL, INC., Debtor.

### Appeal of ORIENTAL FEDERAL SAVINGS BANK.

### No. 90–2174.

United States Court of Appeals, First Circuit.

Heard April 3, 1991.

Decided Nov. 19, 1991.

Rehearing and Rehearing En Banc Denied Jan. 13, 1992.

Ramon Coto–Ojeda with whom Jose R. Gonzalez–Irizarry, Juan M. Surillo–Pumarada, Manuel Fernandez–Bared and McConnell Valdes Kelley Sifre Griggs & Ruiz–Suria, Hato Rey, P.R., were on brief, for appellant.

W.H. Beckerleg with whom Fernando L. Gallardo, Carlos E. Aguilar–Perez and Woods & Woods, Hato Rey, P.R., were on brief, for appellees Francisco Caceres Burgos, et al.

Before CAMPBELL, Circuit Judge, BOWNES, Senior Circuit Judge, and SELYA, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Oriental Federal Savings Bank appeals from a judgment of the district court dismissing Oriental's appeal from an order of the bankruptcy court. The latter had directed Oriental to contribute a proportionate share of the cost of protecting a bankrupt housing development from robberies, vandalism and similar damage. In dismissing the appeal, the district court ruled that requiring Oriental to contribute was mandated both by state law (as the bankruptcy court had found) and by 11 U.S.C. § 506(c), which permits a secured creditor to be charged for the costs incurred by a bankruptcy trustee in preserving or disposing of the secured creditor's collateral. Because part of the development secured Oriental's

loan to the bankrupt developer, and because Oriental's share of the costs was proportionate to that part, we hold that the district court correctly upheld the bankruptcy court under § 506(c). In light of this disposition, we do not rule on the correctness of the bankruptcy court's determination under state law, nor the difficult jurisdictional problems arising were state law the sole basis for recovery.

## I.

The debtor, Parque Forestal, Inc., was the developer of a housing development which purported to provide homeowners with comprehensive security measures. The development was planned to include 114 units of housing located in Rio Piédras, Puerto Rico. It was financed by Oriental Federal Savings Bank ("Oriental"), which held a security interest in the unsold portions of the development, i.e. the homes, homesites and other developer's property that belonged to the developer. Fifty of the units had been sold when, in April 1987, a landslide destroyed a portion of the development, including some of the sensorized perimeter fence. As a result, the debtor found it necessary to contract for a mobile security patrol, in addition to the fence, armed guards, and video monitors already being provided and maintained by an outside contractor. However, the debtor soon stopped paying for these security arrangements, and, sometime in July 1987, Oriental began to pay for both the original security services and the mobile patrol.

On December 10, 1987, Oriental and other creditors filed an involuntary petition against the developer under chapter 11 of the Bankruptcy Code. The estate's most significant asset was the development, whose value was estimated to be no greater than $2 million. Oriental's claim for approximately $5 million therefore exceeded the value of its security interest in the development by several million dollars.

In February 1988, Oriental stopped paying for the mobile patrol. Then, after completing negotiations, the debtor and Oriental submitted to the court a settlement stipulation, under which the debtor's assets, including the development, would either be transferred to Oriental or sold for $2 million. The court, however, considering the objections of several residents of the development and an unrelated unsecured creditor, rejected the settlement in a May 25, 1988 order. Oriental stopped paying for the rest of the security services the following month.

Several Parque Forestal residents (the "residents") then began to pay for the security themselves and filed an "Urgent Motion in Protection of Assets of Debtor's Estate" in the bankruptcy court. They alleged that "[e]stoppel and equity demand that Oriental continue to provide the protection both the debtor and other creditors have come to rely on" by continuing to pay for the security services. In the motion, the residents asked the bankruptcy court to order Oriental to keep doing so. In the alternative, the motion asked that the services, then being paid for by the residents, be considered a priority administrative expense, under Sections 364(c)(1) and (d)(1) of the Bankruptcy Code. Oriental objected to the motion's first request. It argued that there was a "lack of jurisdiction over the subject matter as to whether the alleged obligation of Oriental to [the residents] exists." Oriental further insisted that the residents' contract with the debtor required the residents themselves to pay for the security services, and that, as the residents knew of their obligation to pay, they lacked the "clean hands" necessary for equitable relief. Oriental also objected to the residents' administrative expense argument, on the grounds that "[p]aying the obligation of third parties [i.e., the residents] ... is not contemplated as an administrative expense" under the bankruptcy code.[1]

---

**1.** The debtor, in addition to Oriental, objected to paying for security services out of the estate as an administrative expense. The debtor argued that "[a]ny such expense will be for the sole benefit of the claimants [i.e., the residents]

and/or Oriental," that their deeds required the residents to pay for the services themselves, that the residents' claim was not allowable in bankruptcy, and that the estate had no funds to pay for the services.

The bankruptcy court held a hearing on the motion, at which the residents presented three witnesses—the security contractor and two of the residents—and introduced several documents. No evidence was presented by Oriental or the debtor. Without specifically addressing the question of whether or not it had jurisdiction to determine Oriental's alleged equitable and contractual obligation to the residents, the court granted the motion to require Oriental to help shoulder the costs of the security services. The court ruled that Oriental had "assumed the responsibility to finish the project, including to supply the security services." However, in an August 20, 1988 bench ruling not reproduced in its written order, the court stated, "I'm not deciding ultimately the issue" of whether Oriental was obligated to complete the entire project. The bankruptcy court, therefore, ordered that the cost of the security services be divided between the residents and Oriental, with the residents paying the proportion of the cost equal to the proportion of the units which had been sold, and Oriental paying the balance. The order provided that the amount to be paid by Oriental could be decreased proportionately as more units were sold. Furthermore, having determined that the debtor originally represented to the residents that it would only pay for the services until 51% of the units were sold, the court held that Oriental's obligation to pay would cease once the security measures were fully installed and 50% plus one of the homes were sold.[2]

On September 19, 1988, Oriental filed a motion for reconsideration in which it elaborated on its earlier contention that the bankruptcy court lacked jurisdiction over the residents' claim against it. Oriental further argued that, even if jurisdiction existed, the district court would have to abstain.[3] Finally, Oriental argued that the bankruptcy court had "overreached in ruling that Oriental assumed responsibility to 'finish the project.'" The residents, in their response to the motion, argued that the bankruptcy court was empowered to hear their claim because its jurisdiction over the assets of the estate "would be meaningless if the bankruptcy court could not entertain a motion alleging that these assets were disappearing." The residents also argued, for the first time, that, in addition to the estoppel theory, recovery was justified under 11 U.S.C. § 506(c), which allows the trustee to "recover from property securing an allowed secured claim the ... [costs of preserving] such property to the extent of any benefit to the holder of such claim." The bankruptcy court denied the motion, holding that it had jurisdiction under 28 U.S.C. § 157(b)(2)(A) because the dispute was a "core proceeding" in bankruptcy. The court also stated that its earlier order was not "res judicata [or] collateral estoppel to a different cause of action regarding Oriental's liability or responsibility to terminate the project." The court did not mention the residents' § 506(c) argument.

Oriental appealed to the district court, filing a brief which reiterated its earlier jurisdictional and abstention arguments, and argued that the residents' estoppel theory lacked merit. Oriental's brief also noted that the district court had not mentioned § 506(c) in its ruling but charged that the residents had no standing to recover under that statute. In addition to responding to these arguments, the residents argued that the bankruptcy court's order was correct under § 506(c), and that the district court lacked appellate jurisdiction because the bankruptcy court order was not final.

The district court held that the bankruptcy court had properly exercised jurisdiction because under 28 U.S.C. § 157(b)(2)(A), the action was a "core proceeding." Because it also found that the action did not involve any state law issues better left to the ex-

---

**2.** Although mentioning from the bench the residents' argument that payment for security should be viewed as a priority administrative expense of the estate itself, the court did not mention this point in its written order. Whether or not the estate should have been required to pay for security as an administrative expense is not a subject of the present appeal.

**3.** The point of this argument, addressed to the bankruptcy court, appears to have been either that it should abstain itself or recommend that the district court do so in the event of an appeal.

pertise of state judges, the district court did not abstain. Finally, the court held that the bankruptcy court's order was correct under the estoppel theory, and that, "[u]pon a de novo review of the record as a whole" the order was also justified under § 506(c). The district court therefore dismissed the appeal.

Counsel have since informed us at oral argument of the following events. In June 1989 Oriental bought the debtor's interest in the Parque Forestal development at a judicial sale and began voluntarily to pay for its proportionate share of the security services. The bankruptcy proceeding was dismissed in January 1991, but Oriental has posted an appeal bond in the amount of $48,000, which represents the amount it was required by the bankruptcy court order to pay between the time it stopped paying for the services in July 1988 and the time it bought the property in June 1989. Thus, the practical issue in this appeal is whether the residents are entitled to collect the proceeds of the $48,000 bond posted by Oriental.

The parties present several arguments on appeal. The residents argue that we lack appellate jurisdiction because the district court's order was not final. We reject this argument because the bankruptcy case has been dismissed, making the orders below, in effect, final. Oriental argues that the residents' claim is outside the subject matter jurisdiction of the federal courts, and that the claim could not be finally decided by a non-Article III bankruptcy judge. Although these arguments could plausibly have merit were the state law estoppel theory the only basis for the district court's order, we reject them because of the district court's holding, in the alternative, that the bankruptcy court's order was correct under § 506(c). On the merits, we reject Oriental's argument that the district court erred in its application of § 506(c). We do not consider, therefore, either the merits of, or the jurisdictional problems associated with, the bankruptcy court's estoppel theory.

## II.

### A. *Appellate Jurisdiction*

Under 28 U.S.C. § 158(d) "[t]he courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered [by the district courts or bankruptcy appellate panels on appeal from the bankruptcy courts]." The residents argue that the bankruptcy court order was not final, hence not appealable, because it allowed the amount to be paid by Oriental to be adjusted with the sale of more homes, and because it left open the question of Oriental's responsibility to complete the entire project. Under this theory, the district court order was not final because it affirmed a non-final order of the bankruptcy court.

While the question is close, a good case can be made that the bankruptcy court's order was final when it was appealed to the district court. But even assuming, for purposes of argument, that the order then lacked finality, the subsequent dismissal of the bankruptcy proceeding makes this assumption largely irrelevant. The Supreme Court has held that "the requirement of finality is to be given a 'practical rather than a technical construction.'" *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964) (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949)). Here, where the bankruptcy has been dismissed, and the only remaining practical issue is one controlled by this appeal—to wit, whether the residents are entitled to the proceeds of the $48,000 appeal bond posted by Oriental—it would be senseless to dismiss this appeal on the supposition that the order continued to lack finality. Whether or not the bankruptcy court's order was final at the time it was appealed to the district court, there is no possibility now that either court's order will be changed or become moot, or that "piecemeal appeals" will waste the time of this court or the parties. *See Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374, 101 S.Ct. 669, 673–74, 66 L.Ed.2d 571 (1981) (noting problem of piecemeal appeals); *In re Spillane*, 884 F.2d 642, 644–

45 (1st Cir.1989) (where a bankruptcy trustee had terminated his attorney's services, and the case was set to be transferred to California, an interim award of attorney's fees "should be treated as final"). We hold, therefore, that the district court's order dismissing the appeal was final for purposes of appeal to this court, and that we have jurisdiction to review it.

**B.** *Subject Matter and Bankruptcy Jurisdiction*

■ Oriental argues that there is no federal subject matter jurisdiction over its dispute with the residents, and that, even if there is, the dispute was beyond the power of a non-Article III (bankruptcy) judge to decide. The strength of this argument very much depends on which of the two substantive legal rationales used by the courts below we apply. In permitting the residents to recover from Oriental, the bankruptcy court did so on the theory that Oriental was estopped to refuse payment, a theory predicated on Puerto Rico law. The district court endorsed this rationale, but also adopted an alternative one: namely, that the bankruptcy court's order was authorized by 11 U.S.C. § 506(c). We believe that the district court properly upheld the bankruptcy court's order under § 506(c). As a result, we find it unnecessary to rule upon Oriental's jurisdictional objections insofar as predicated on use of the estoppel theory.

Were it necessary for us to investigate the latter, we would be faced with an exceedingly difficult question. Whether federal subject matter jurisdiction exists to decide a state law claim depends on whether the claim is "related to" the bankruptcy. *See* 28 U.S.C. § 1334(b). The term "related to" has not been given a settled definition by the courts of appeals; some courts have given it a broad construction while others have defined it more narrowly. *See, e.g., Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984) (proceeding "related to" bankruptcy when outcome has any conceivable effect on estate); *In re Turner,* 724 F.2d 338, 341 (2d Cir.1983) (mentioning the "conceivable effect" test but apparently requiring a "significant connection" to estate).

And even assuming the estoppel claim were "related to" the bankruptcy, the further question would arise whether a bankruptcy court, a non-Article III tribunal, had jurisdiction to resolve such a claim between these individual parties. This would require an interpretation of the Supreme Court's decision in *Northern Pipeline Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and related legislation. In *Marathon,* the Supreme Court held the Bankruptcy Act of 1978 unconstitutional because it allowed a bankruptcy judge to decide a debtor-in-possession's claim for damages under a contract entered into before the filing of the bankruptcy petition. The Court held that the Act "violate[d] the command of Art. III that the judicial power of the United States must be vested in courts whose judges enjoy the protections and safeguards specified in that Article." *Id.* at 62, 102 S.Ct. at 2867. The Court implied that certain claims could constitutionally be decided by bankruptcy judges, who lack Article III protections, but held that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the" contract rights at issue in *Marathon. Id.* at 71, 102 S.Ct. at 2871–72.

After *Marathon,* Congress attempted to cure the constitutional defects of the 1978 Act by enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984. That statute grants to bankruptcy courts the authority to "hear and determine all cases under title 11 and all core proceedings arising under title 11" and enter judgment therein. 28 U.S.C. § 157(b)(1). Core proceedings are defined as "matters concerning the administration of the estate; ... other proceedings affecting the liquidation of the assets of the estate," and several other more specific types of claims. 28 U.S.C. § 157(b)(2). Although bankruptcy judges may also hear non-core proceedings, they may not enter judgment therein. Instead, they may only present "proposed findings of fact and conclusions of law" to the district court, which then may enter a

final judgment only after "reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).[4]

It is, in any case, no easy matter to resolve Oriental's argument that the bankruptcy court lacked jurisdiction to impose liability under that court's announced theory, to wit, state law estoppel. The residents characterize their estoppel claim as having a significant effect on the administration of the estate under § 157(b)(2) because the security protected the estate from vandalism and robberies. However, the legal basis of the residents' estoppel claim was the enforceability under Puerto Rico law of an alleged private arrangement; its effect upon the administration and protection of the estate was incidental.

We need not, however, decide whether the residents' estoppel claim was within the bankruptcy court's core jurisdiction, nor whether such a claim fell within federal subject matter jurisdiction. For reasons stated below, *infra* pp. 511–12, we are satisfied that the bankruptcy court was empowered to grant the relief it did via the alternate route of 11 U.S.C. § 506(c). A proceeding under that statute manifestly fell within federal subject matter jurisdiction and was a "core proceeding," so as to permit the bankruptcy court to act on its own.

Under 28 U.S.C. § 1334(b), federal jurisdiction exists over "civil proceedings arising under title 11." Quite obviously, an action to enforce 11 U.S.C. § 506(c) arises under title 11. Even more to the point, an action to enforce § 506(c) is plainly a "core proceeding." That statute, enacted as § 506(c) of the Bankruptcy Reform Act of 1978, grants to the trustee[5] a substantive right to recover against a secured creditor. This is a federal right, unknown to state law, which exists only in bankruptcy. As such, the enforcement of that right must be subject to resolution by a bankruptcy judge. *See Matter of Wood*, 825 F.2d 90, 97 (5th Cir.1987) ("a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case").

The only jurisdictional question remaining is whether the bankruptcy court's failure to consider and cite to § 506(c) as a basis for its order prevents the district court, and ourselves, from sustaining the exercise of its authority under that unmentioned statute. We think not. A reviewing court (such as the district court was here) may affirm the judgment of a lower court based on grounds different from those used by the lower court. *See Johnson v. General Electric*, 840 F.2d 132 (1st Cir. 1988); *Werle v. Rhode Island Bar Association*, 755 F.2d 195 (1st Cir.1985) (both cases affirming district court on different grounds than those relied upon below). We see no reason why this principle may

---

**4.** The text of the statute is set out more fully below:

(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section. . . .

(2) Core proceedings include, but are not limited to-

(A) matters concerning the administration of the estate;

[ (B)-(N) set forth other specific types of actions]

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship.

[ (3)-(5) omitted]

(c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

28 U.S.C. § 157.

**5.** As we hold, *infra*, this right may, in special circumstances, be enforced by parties who stand in the shoes of the trustee, i.e., here the residents.

not extend to rulings that may have a critical effect upon a lower court's jurisdiction, as well as to others.[6] Here, the § 506(c) theory was called to the attention of the bankruptcy court; and the district court could later apply it without further factual development of the record below.[7] Both sides discussed the § 506(c) theory in their briefs before the district court. We therefore hold that, because § 506(c) dictated the same result, and because the bankruptcy court had the authority to take jurisdiction and enter final judgment under § 506(c), the bankruptcy court's order may stand, regardless of whether it would have had the jurisdiction and authority to decide the claim based on the estoppel theory which it cited.[8]

### C. *Section 506(c)*

We turn now to the merits of the bankruptcy court's order viewed as the exercise of its authority under § 506(c).

■ It is the general rule that the unsecured creditors must assume the costs of administering the estate, *see Matter of Trim–X, Inc.*, 695 F.2d 296, 301 (7th Cir. 1982). Section 506(c) provides, however, that "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of *preserving*, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c). [Em-

phasis supplied.] To recover here under this section, the residents must overcome two hurdles. First, they must establish that they have standing to sue under § 506(c), which speaks only of recovery by the trustee. Second, they must establish that the substantive provisions of § 506(c) allow recovery in the circumstances of this case.

■ With respect to the first issue, we hold that the residents had standing to recover under § 506(c). Although there is contrary authority in the bankruptcy and district courts, *see Matter of Delta Towers, Ltd.*, 924 F.2d 74, 75–76 (5th Cir.1991) (citing cases), the only two courts of appeals which have considered the question have permitted recovery by third parties who equitably come to stand in the trustee's shoes. *See id.; In re McKeesport Steel Castings Co.*, 799 F.2d 91, 93–94 (3d Cir. 1986). In both cases a utility company had provided service to a chapter 11 debtor in possession, giving rise to a potential claim by the utility against the estate and a § 506(c) claim by the estate against a secured creditor who had benefited from the utility's services. The debtor in possession refused to sue the secured creditor on behalf of the utility. The court, therefore, allowed the utility to sue directly under § 506(c); in the words of the *McKeesport* court,

[t]he rule that individual creditors cannot act in lieu of the trustee is often breach-

---

**6.** We also think that this rule extends appropriately through the two tiers of appellate review in a bankruptcy case.

**7.** While in some cases affirmance on a different legal ground from that used below might deprive a party of an opportunity to present necessary facts, that is not the case here. Since the district court's decision that § 506(c) would dispose of the case, Oriental has raised no serious challenges to the facts necessary to the § 506(c) ruling. Before this court, Oriental's primary argument concerning § 506(c) is one of law; Oriental contends that only a bankruptcy trustee may recover under § 506(c). *See* infra. Oriental's only factual arguments are that, insofar as it was concerned, security was unnecessary because there was no "personal or movable property at the project," and because "the partially *constructed houses* ... *could obviously not be removed.*" As noted, *infra*, we accept Oriental's first point. Oriental's second point is

not dispositive of the § 506(c) ruling; although intruders could not "steal" a house, they could vandalize it, and the value of that house and of the remaining lots is greater if the development as a whole is not being broken into. Oriental does not contest the district court's finding that some of the partially constructed homes were being vandalized. Nor does Oriental contest the basic findings of the bankruptcy court that break-ins were occurring and that security was needed to prevent them.

**8.** Oriental also argues that abstention was mandated by 28 U.S.C. § 1334(c)(2). Regardless of whether this is true, that statute provides that "[a]ny decision to abstain or not to abstain made under this subsection is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title...." Thus, we cannot review the district court's decision not to abstain.

ed when sufficient reason exists to permit the breach. In this case neither the debtor in possession nor a creditors committee had reason to make a claim on behalf of [the utility].... Thus, because [the utility] had a colorable claim for expenses and was the only creditor that would zealously pursue that claim, it has standing to bring a § 506(c) action.

799 F.2d at 94. A similar rationale applies in this case. The bankruptcy court found that, under its prior agreements with the residents, the debtor had certain obligations to provide for the security. The district court, apparently having accepted this finding, referred to the residents as "creditors." Yet the debtor in possession had no incentive to make a claim against Oriental on behalf of these creditors. The debtor in possession had no funds, and its debt to Oriental, the secured creditor, exceeded the value of the bankrupt estate, including the unsold remainder of the development. Under these circumstances, we think the residents, who were themselves now paying for the security, could be allowed to force Oriental under § 506(c) to reimburse its proper share of the security costs.

■ In regard to whether a proper § 506(c) claim was made out, the residents had to show that "(1) the expenditure was necessary, (2) the amounts expended were reasonable, and (3) the [secured] creditor benefitted from the expenses." *Matter of P.C., Ltd.*, 929 F.2d 203, 205 (5th Cir.1991) (citations omitted). There can be little doubt that the first two requirements were met in this case. The security expenses were both "reasonable," and "necessary" because, as the court found, the property had been broken into several times.

To establish the third requirement, benefit to the secured creditor, a party must show that it "expend[ed] the funds primarily to benefit the [secured] creditor, who ... in fact directly benefit[ted] from the expenditure." *Brookfield Production Credit Ass'n v. Borron*, 738 F.2d 951, 952 (8th

Cir.1984). We think the residents met the requirement that Oriental directly benefit from the provided security services. Oriental had an overriding interest in the portions of the development not sold, which consisted of between 15 and 20 partially constructed homes and approximately 50 vacant homesites.[9] The district court supportably concluded that some of the partially constructed homes had been vandalized. It was a reasonable inference that security arrangements were needed to maintain the development's overall value, a matter of obvious concern to Oriental since the unsold portion of the development was its primary security. Even if the homes that had been sold to private owners bore the brunt of the break-ins, the unsold homes and the vacant house lots would lose value for their intended purposes if the break-ins continued. Security had been a selling point for the original development, and continued security was beneficial to ensure that homes could be profitably sold in the future. Indeed, Oriental appears to have acknowledged this benefit, having voluntarily paid for its share of the security both before and after the time period at issue. Oriental's collateral thus clearly benefited from the provision of security to the development as a whole.

The district court's order only required Oriental to pay for the security in proportion to the number of the unsold units. Given this equitable division of cost between the residents and Oriental, we think the court met the requirement of § 506(c) that the recovered funds be spent primarily for that creditor's benefit. *Brookfield,* 738 F.2d at 952.

To be sure, a Seventh Circuit panel intimated in 1982, shortly after enactment of § 506(c), that an earlier requirement that a secured creditor may only be charged if it consented to the expense might still be germane. *Trim–X,* 695 F.2d at 301. Oriental obviously did not consent to be charged here. On the other hand its refusal to pay, in these circumstances, did not

---

9. We shall assume, arguendo, that Oriental had no claim on the building equipment and ma-

chinery that was being stolen from the site.

evidence a rejection of the security services. More likely, Oriental simply believed that it could get the security it needed without having to pay for it. Because the residents had already suffered from several break-ins, they were not likely to cease paying, even without a contribution from Oriental. The unsold units forming Oriental's collateral would likely benefit from the residents' provision of security, as all properties were within a single development, and it would be difficult to provide security for some units without making then all more secure. Oriental may also have believed that by ceasing to pay for the security, it would strengthen its bargaining position vis-a-vis the residents, some of whom had just blocked its purchase of the development. In these circumstances, it could be inferred that Oriental benefited from the security and consented to its desirability if not its expense.

Because a bankruptcy court has jurisdiction to hear and enter judgment in a proceeding under § 506(c), and because the result reached by the bankruptcy court in this case was consistent with authority conferred by § 506(c), the district court's order dismissing Oriental's appeal is *affirmed.* *Costs to appellee.*