980 F.2d 110
 35 ERC 1793, 61 USLW 2333, Bankr. L. Rep.
P 75,020,
23 Envtl. L. Rep. 20,308
 In re CUYAHOGA EQUIPMENT CORPORATION, Debtor.
PUBLICKER INDUSTRIES INC., Appellant,
v.
UNITED STATES of America; the Pennsylvania Department of
Environmental Resources; Resolution Trust Corporation, as
Receiver of Freedom Savings and Loan Association; Chester
B. Salomon, as Chapter 11 Trustee, Appellees.
 No. 1559, Docket 92-5010.
 United States Court of Appeals,
Second Circuit.
 Argued May 13, 1992.
Decided Nov. 12, 1992.
 
 Duane A. Siler, Washington, D.C. (Timothy A. Vanderver, Jr., Patton, Boggs & Blow, Washington, D.C.; Alan A. D'Ambrosio, Schnader, Harrison, Segal & Lewis, New York City, of counsel), for appellant.
 Vicki L. Plaut, Environment and Natural Resources Div., Washington, D.C. (Charles Openchowski, John Averback, Patricia Mott, Brian Nishitani, E.P.A., Barry M. Hartman, Acting Asst. Atty. Gen., Environmental and Natural Resources Div., Otto B. Obermaier, U.S. Atty., S.D.N.Y., Edward A. Smith, Asst. U.S. Atty., S.D.N.Y., Dirk D. Snel, Philip E. Karmel, Attorneys, Environment and Natural Resources Div., Washington, D.C., of counsel), for appellee U.S.
 Alec P. Ostrow, New York City (Salomon Green & Ostrow, P.C., G.S. Peter Bergen, LeBoeuf, Lamb, Leiby & MacRae, of counsel), for appellee Chester B. Salomon, as Chapter 11 Trustee.
 Edward M. Fox, New York City (James Gadsden, Carter, Ledyard & Milburn, of counsel), for appellee Resolution Trust Corp., as Receiver of Freedom Sav. and Loan Ass'n.
 Before: CARDAMONE, PIERCE and MAHONEY, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 For 73 years Publicker Industries, a publicly-held small liquor distillery, produced whiskey, industrial alcohol and chemical solvents on a 38-acre parcel of land on Delaware Avenue in Philadelphia, Pennsylvania. From this location, in an industrial section of the city, alongside the Delaware River and under the Walt Whitman Bridge, with over 1,000 employees, Publicker distilled products that enjoyed public acceptance into the 1970s. But in the 1980s the distillery fell on hard times. It ceased operations in February 1986 and sold its 38-acre site to Overland Corporation. At the time there stood on the property several buildings, a power plant, warehouses and deep production wells together with over 400 large storage tanks and several thousand drums, many of which were later discovered to contain hazardous substances. In going out of business and selling a site that contained a large residue of hazardous wastes, Publicker set the stage for the appeal presently before us. The purchaser, Overland, went bankrupt, prompting bankruptcy litigation in one venue and environmental cleanup litigation against Publicker and its successors in another. We are asked to decide which forum takes precedence in disposing of litigation when bankruptcy and environmental cleanup litigation pending in two different courts, one in New York and the other in Pennsylvania, appear to be on a collision course.
 
 
 2
 Publicker appeals from an order entered on December 23, 1991 in the United States District Court for the Southern District of New York (Freeh, J.), approving a settlement agreement that resolved those competing bankruptcy and environmental claims. The bankruptcy claims arose in a consolidated proceeding commenced in the Southern District of New York, when in January 1987 Overland, not having any better luck at this site than Publicker, filed a Chapter 11 petition, later consolidated with a Chapter 11 proceeding already pending involving its parent company, Cuyahoga Wrecking Corporation. The environmental claims arose out of a cost recovery action brought in December 1990 under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607 (1988), by the Environmental Protection Agency (EPA) in the United States District Court for the Eastern District of Pennsylvania against Publicker, Cuyahoga and Overland. The EPA sought to recover past and future response costs expended in cleaning up the hazardous substances at Publicker's former Philadelphia site now owned by Overland.
 
 
 3
 Freedom Savings and Loan Association (Freedom Savings or the bank), a creditor of Overland, and the United States, among other parties, sought the New York bankruptcy court's approval of a settlement agreement resolving their competing claims to the proceeds arising from the sale by Overland of the Publicker site. The settlement agreement included a covenant by the United States not to sue Freedom Savings and a contribution protection provision, which together released Freedom Savings and the Resolution Trust Corporation from further liability in the Pennsylvania environmental litigation. When the settlement agreement was presented to the district court, it approved the settlement.
 
 BACKGROUND
 
 4
 Publicker sold the subject site to Overland for $3 million. Freedom Savings took a first mortgage on the real property in the amount of $2.7 million, and in return for an additional $4 million, the Bank took a first priority security interest in inventory and personal property. From February 13, 1987 to early 1988 Freedom Savings had access to and control over the Publicker property in order to protect and secure its collateral.
 
 
 5
 After the January 1987 consolidation of the Overland and Cuyahoga bankruptcy proceedings and the appointment of a trustee, a large fire occurred at the site in June 1987 that brought the EPA to the facility. The EPA's inspection revealed more than 1 million gallons of waste material, 3,000 waste-filled storage drums, and 7,000 gallons of unused chemicals in production process lines. Pursuant to a plea bargain in which Publicker pleaded guilty to one count of unlawfully storing hazardous waste, the EPA ordered it to implement certain measures to stabilize these volatile and dangerous conditions. Publicker's actions proved inadequate.
 
 
 6
 Because severe risks to human health and the environment remained, the EPA undertook its own emergency response action in December 1987. The site was placed on the National Priority List of hazardous waste sites most in need of cleanup in 1989. It currently ranks 44th on that list, 40 C.F.R. pt. 300 App. B (1991). The EPA has expended more than $14 million in response costs to date. As noted, in December 1990, the agency commenced the currently ongoing cost recovery action under CERCLA in the Eastern District of Pennsylvania against Publicker, Overland and Cuyahoga. United States v. Publicker Indus., Inc., Civ. No. 90-7984 (E.D.Pa.).
 
 
 7
 Meanwhile, in the Southern District of New York bankruptcy proceeding, the trustee had been actively disposing of certain assets of the debtors, including the troubled Publicker site. On February 23, 1988 the bankruptcy court for the Southern District of New York permitted Freedom Savings to relinquish control of this real property. On May 27, 1988 the trustee entered a contract for the sale of the property with Delaware Avenue Enterprises, Inc. that contained an option permitting the buyer to defer taking ownership of the facility for up to 15 years thereby avoiding potential CERCLA liability.
 
 
 8
 The bankruptcy court approved this agreement in July 1988, but declined to approve an initial agreement between the bank and the trustee allocating approximately 80 percent of the proceeds from the option sale to the bank and 20 percent to the trustee. The United States objected to this arrangement because it had a competing claim to the sale proceeds under § 506(c) of the Bankruptcy Code, 11 U.S.C. § 506(c) (1988), as an administrative claimant preserving the value of collateral in which secured creditors had an interest.
 
 
 9
 Negotiations to resolve the conflicting claims began between the trustee, Freedom Savings, the United States and the Pennsylvania Department of Environmental Resources. The bank, experiencing the kind of misfortune that all of the parties associated with this real property albatross had suffered, went into receivership in July 1987. The Resolution Trust Corporation became Freedom Saving's conservator in February 1989 and became its receiver when the bank was declared insolvent on October 13, 1989. Resolution Trust, standing in the bank's shoes, then joined in the negotiations regarding the option sale proceeds.
 
 
 10
 In August 1990 the parties reached a settlement agreement that the district court eventually approved. The agreement apportions the option sale proceeds as follows: (1) the United States is to receive $693,000 on behalf of the EPA in exchange for a covenant that it will not sue Freedom Bank and the various banking agencies, including Resolution Trust, under CERCLA § 9607(a)(2) for cleanup costs incurred at the Publicker site and will mark "settled" its § 506(c) claim; (2) Freedom Savings will receive $693,000, settling its claim under 11 U.S.C. § 502 (1988) concerning its secured interest and mortgage with Overland; (3) the Pennsylvania Department of Environmental Resources will receive $40,000 for costs it incurred at the Publicker site cleanup; (4) the National Oceanographic and Atmospheric Administration and the Department of the Interior will collectively receive $40,000 and agree to release Freedom Savings and its receiver from liability for natural resource damages; (5) the trustee will receive $110,000 covering the bankrupt estate's § 506(c) claim and other administrative costs; and (6) the balance will be allocated to various claims unrelated to the present action.
 
 
 11
 The settlement agreement further protects the bank and its federal regulatory agencies against contribution claims that may be brought by potentially liable defendants in the CERCLA cost recovery action. The parties expressly conditioned the covenant not to sue on the truthfulness of certain representations made by the bank and regulatory agency regarding the extent of the bank's activities while it was in control of the site, particularly its representation that it did not manage the site and took only limited actions in monitoring and safeguarding it.
 
 
 12
 This agreement was first presented to the bankruptcy judge in the Southern District on August 8, 1990. Publicker objected and moved to withdraw the action from the bankruptcy court. The United States also moved for withdrawal from the bankruptcy court in order to seek approval from the United States District Court for the Southern District of New York. Pursuant to the trustee's request, the bankruptcy court approved the settlement on November 6, 1991, stating that its approval was solely on behalf of the trustee, without prejudice to Publicker's objections, and subject to final approval by the district court.
 
 
 13
 At a December 2, 1991 hearing before the district court, Publicker raised only certain of the arguments it had previously made in the bankruptcy court in objecting to the settlement, those it now raises on the instant appeal, that is, (1) an objection to the district court's jurisdiction, (2) a request for a transfer of venue to the Eastern District of Pennsylvania, and (3) objections to the fairness of the settlement.
 
 
 14
 By written decision issued December 23, 1991, the district court approved the settlement agreement. Judge Freeh found jurisdiction to approve the agreement since it resolved claims related to a bankruptcy action then pending before the district's bankruptcy court. He refused to transfer the action to the Eastern District of Pennsylvania both because the government's § 506(c) bankruptcy claim could not have been brought there originally and because Publicker had not shown the inconvenience required to warrant a transfer. The district court additionally determined that the settlement was fair, reasonable and lawful. From this judgment, Publicker appeals. We affirm.
 
 DISCUSSION
 
 15
 Publicker challenges the district court's judgment on three grounds. It asserts: (1) the district court lacked jurisdiction to approve the settlement under CERCLA § 113 because of the government's then-pending cost recovery action in the Eastern District of Pennsylvania; (2) the district court in the Southern District of New York should have transferred the request for settlement approval to the Eastern District of Pennsylvania because the bankruptcy code provided no independent basis for jurisdiction; and (3) the district court erred when it found the settlement between the bank and the government to be fair, reasonable and consistent with CERCLA. We discuss these issues in order.
 
 I Jurisdiction
 
 16
 Jurisdiction was properly exercised over the settlement agreement. The district court had jurisdiction over the bankruptcy claims under 28 U.S.C. § 1334(b) (1988)--since the agreement compromised claims related to the bankruptcy action then before it--and over environmental actions under CERCLA's broad grant in § 9613(b) to the federal district courts.
 
 
 17
 Publicker incorrectly believes that environmental questions alone remained at issue after the bankruptcy court partially approved the settlement, and that therefore jurisdiction to approve what remained of the agreement could only be supported by jurisdiction under CERCLA. Here the district court approved the settlement of both bankruptcy and environmental claims. Since the bankruptcy court conditionally approved the agreement only with respect to the trustee--subject to the approval of the district court--the compromised bankruptcy claims of both the government and the bank were before the district court.
 
 A. Bankruptcy Jurisdiction
 
 18
 In light of Freedom Savings' claim to the option proceeds under § 502 and the government's claim under § 506(c), the district court possessed jurisdiction over them pursuant to 28 U.S.C. § 1334(b) (1988) as claims related to the bankruptcy action. Section 1334(b) provides, "Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." The bankruptcy questions raised by the parties were civil proceedings "related to cases under title 11" as required by § 1334(b). See In re Wolverine Radio Co., 930 F.2d 1132, 1141-42 (6th Cir.1991) (noting § 1334(b) jurisdiction requires only that matter before court be "related to" bankruptcy), cert. dismissed, --- U.S. ----, 112 S.Ct. 1605, 118 L.Ed.2d 317 (1992). Thus, solid authority supports the district court's power to approve the settlement with respect to the bankruptcy issues.
 
 
 19
 The § 506(c) and § 502 claims compromised under the settlement constituted civil proceedings under § 1334(b) even without the formal commencement of a civil action by the parties. Congress aimed to give the term "civil proceedings" in § 1334(b) an expansive interpretation. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 445 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6401 ("[A]nything that occurs within a case is a proceeding. Thus, proceeding here is used in its broadest sense, and would encompass ... contested matters, adversary proceedings, and plenary actions[, as well as] any disputes related to administrative matters...."). Claims asserting alleged rights under §§ 502 and 506(c) constitute contested matters; when the parties seek the court's sanction for their compromise through a motion for approval, that motion constitutes a civil proceeding. See Fed.R.Bankr.P. 9014 advisory committee's note (noting litigation to resolve dispute before bankruptcy court is contested matter); 9 Collier on Bankruptcy p 9014.03 (15th ed. 1992).
 
 
 20
 The §§ 502 and 506(c) claims relate to the consolidated Overland bankruptcy action because they cannot exist outside the sphere of federal bankruptcy law. The test for determining whether litigation has a significant connection with a pending bankruptcy proceeding is whether its outcome might have any "conceivable effect" on the bankrupt estate. If that question is answered affirmatively, the litigation falls within the "related to" jurisdiction of the bankruptcy court. See In re Turner, 724 F.2d 338, 340-41 (2d Cir.1983) (Friendly, J.). Beyond merely having any "conceivable effect", see Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir.1984); 1 Collier on Bankruptcy p 3.01[c][iv] (15th ed. 1992), or "any significant connection" with the bankrupt estate, see In re Turner, 724 F.2d at 341--either of which would establish § 1334(b) jurisdiction--these claims bring into question the very distribution of the estate's property and its allocation between a party asserting the status of constructive trustee and a first priority secured creditor. See In re Parque Forestal, Inc., 949 F.2d 504, 510 (1st Cir.1991) (noting that § 506(c) right exists only in bankruptcy and must be subject to resolution by bankruptcy judge); Home Ins. Co. v. Cooper & Cooper, Ltd., 889 F.2d 746, 749 (7th Cir.1989) (holding dispute affecting distribution of assets "relates to" bankruptcy); see also In re P.D.S. Dev. Corp., 103 B.R. 93, 95 (Bankr.S.D.N.Y.1989). Hence, § 1334(b) undoubtedly vested the district court with the power to approve the agreement between the parties at least to the extent it compromised the bankruptcy claims asserted by the bank and the government.
 
 
 21
 The district court's authority to approve the settlement, with respect to the environmental causes of action, could properly be founded on its supplemental jurisdiction. Given an independent jurisdictional source like that provided by § 1334(b), federal courts possess supplemental jurisdiction over related claims. See 28 U.S.C.A. § 1367(a) (West Supp.1992) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in [an] action within [a court's] original jurisdiction that they form part of the same case."). In the case at hand, the environmental causes form part of the same case with the bankruptcy claims because all of them, resolved in the settlement agreement, concern the government's attempts to remedy hazardous substance releases at the Publicker site and they remain intertwined in the competing parties' efforts to secure a share of the proceeds of the option sale. Even without an independent source of jurisdiction over the environmental actions, § 1367(a) therefore vested the Southern District with jurisdiction over them as related claims forming part of the same case pending before it. Cf. In re Delta Towers, Ltd., 924 F.2d 74, 79 (5th Cir.1991) (emphasizing district court's discretion to decide related claims).
 
 B. CERCLA Jurisdiction
 
 22
 The district court did not need to rely solely on its supplemental jurisdiction to approve the settlement, because additional authority arises from CERCLA's jurisdictional grant vesting the power in all district courts to approve agreements compromising potential CERCLA claims asserted by the government. CERCLA's jurisdictional provision broadly states, "the United States district courts shall have exclusive original jurisdiction over all controversies arising under [CERCLA]." 42 U.S.C. § 9613(b) (1988). This original grant remains in full force even when the government has already begun an action against other parties in a different district.
 
 
 23
 Exclusive jurisdiction like that established in § 9613 preempts all other types of courts from hearing certain matters but permits any court of the specified type to exercise jurisdiction. See 1A Moore's Federal Practice p 0.201 (2d ed. 1991). Contrary to Publicker's contentions, § 9613's grant of exclusive jurisdiction does not limit jurisdiction to a single district court. The exclusive jurisdictional grant to the "district courts" means only that no court other than a federal district court may hear and determine CERCLA controversies. The limitation is not to be read to require that once a CERCLA action has been commenced in one district court any subsequent matter relating to it must be resolved only in that same district court. Cf. In re Chateaugay Corp., 944 F.2d 997, 999 (2d Cir.1991) (environmental actions from all 50 states reviewed by single district court in bankruptcy action).
 
 
 24
 When Congress has sought to restrict not simply the kind of court in which an action may be brought but also the specific court that may hear such action, it has done so explicitly. See, e.g., 28 U.S.C. § 1334(d) (1988) ("The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located...."); 26 U.S.C. § 7428 (1988) (declaratory judgment action in certain tax cases must be brought in United States Tax Court, United States Claims Court, or United States District Court for the District of Columbia); 28 U.S.C. § 1365 (1988) (Senate actions must be brought in United States District Court for the District of Columbia).
 
 
 25
 Absent an express restriction set forth in CERCLA or a clearly stated legislative purpose limiting the statute's plain meaning, a judicial limitation on § 9613's jurisdictional grant would be an unwarranted judicial intrusion into a matter confided to Congress. Cf. Union Bank v. Wolas, --- U.S. ----, ----, 112 S.Ct. 527, 531, 116 L.Ed.2d 514 (1991). The legislative history cited by Publicker is inapposite. It simply supports the proposition that judicial review of settlements under CERCLA is desirable to ensure good faith negotiations and fairness to other defendants and the public; it does not purport to restrict the district courts' jurisdiction. See H.R.Rep. No. 253, 99th Cong., 2d Sess., pt. 1, at 59 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2841 (importance of court review of consent decrees to protect public interest); H.R.Rep. No. 253, 99th Cong., 2d Sess., pt. 3, at 19 (1985), reprinted in 1986 U.S.C.C.A.N. 3038, 3042 (judicial approval required to prevent improper settlements).
 
 
 26
 Publicker unsuccessfully seeks comfort from 42 U.S.C. § 9622(d)(1)(A) (1988), regarding consent decrees for remedial cleanup actions, and 28 C.F.R. § 50.7 (1991), concerning Justice Department policy on consent judgments in actions to enjoin pollutant discharge. Section 9622(d)(1)(A) provides merely that remedial action consent decrees "shall be entered in the appropriate United States district court," while § 50.7(b) declares the Justice Department's policy that pollution abatement agreements will be entered with "the court." Those legislative and regulatory provisions provide little aid to Publicker's position. Further, they speak to inapposite situations. Pollution abatement and cleanup activities require ongoing court supervision. The present action deals only with the cost of a recovery and how it is to be shared, which does not implicate continuing judicial involvement.
 
 
 27
 As a consequence, jurisdiction to approve the settlement agreement was appropriately exercised by the district court based on CERCLA's general grant of jurisdiction to the "district courts" and on the court's jurisdiction over title 11 proceedings and related matters.
 
 II Transfer
 
 28
 Publicker next insists that even were the district court to have had jurisdiction to approve the settlement agreement, it should have transferred the matter--or at least the CERCLA portion--to the Eastern District of Pennsylvania, and that its failure to do so constituted reversible error under 28 U.S.C. § 1404 (1988). Section 1404(a) provides, in relevant part, "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."
 
 
 29
 As an initial matter, non-parties usually lack standing to challenge venue dispositions. See Trans World Airlines, Inc. v. Civil Aeronautics Bd., 339 F.2d 56, 63-64 (2d Cir.1964), cert. denied, 382 U.S. 842, 86 S.Ct. 40, 15 L.Ed.2d 82 (1965); 3B Moore's Federal Practice p 24.19 (1992). Even assuming Publicker had standing to dispute the government's choice of venue, it still failed to demonstrate an abuse of the trial court's discretion in refusing to make the requested transfer to the Eastern District of Pennsylvania. The reason is plain. The policy of conserving scarce judicial resources militates in favor of a versatile solution to this sort of legal problem, leaving latitude to the district courts for the exercise of their informed discretion. See Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183-84, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952) (emphasizing court's discretion in such matters); Calavo Growers of Cal. v. Belgium, 632 F.2d 963, 966 (2d Cir.1980) (noting district court's "wide discretion"), cert. denied, 451 U.S. 934, 101 S.Ct. 2012, 68 L.Ed.2d 321 (1981).
 
 
 30
 Publicker mounts its attack first by pointing out that the instant refusal ignored the policy favoring consolidation of related litigation. This challenge overlooks the fact that bankruptcy and environmental claims--which in this case were related--remained before the district court in New York. Thus, keeping the entire action in New York was consonant with the policy of consolidation. Appellant's second challenge focuses on the general rule that two competing but related disputes brought in different fora should be consolidated in the court in which the first action was brought. See, e.g., Fort Howard Paper Co. v. William D. Witter, Inc., 787 F.2d 784, 790 (2d Cir.1986); William Gluckin & Co. v. International Playtex Corp., 407 F.2d 177, 178 (2d Cir.1969). This rule usually applies when identical or substantially similar parties and claims are present in both courts. See Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215, 218 (2d Cir.1978), cert. denied, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). Its governance is more problematic here where there are separate and distinct parties and claims embraced in the Southern District of New York settlement from those present in the Eastern District of Pennsylvania. Further, it remains unclear whether the CERCLA cost recovery action was actually brought prior to the time when the settlement agreement compromised the CERCLA claim against Freedom Savings. Although the government's motion seeking approval of the compromise post-dated the filing of the cost recovery action against Publicker in Pennsylvania, the settlement agreement, its predecessor and the bankruptcy petition were all filed with the New York bankruptcy court several years before the Pennsylvania action commenced.
 
 
 31
 Publicker's challenge ultimately fails because the policy favoring consolidating related disputes is subject to the discretion of the trial court. See Kerotest, 342 U.S. at 183-84, 72 S.Ct. at 221; William Gluckin, 407 F.2d at 179. The rule that grants priority to the suit first filed is subject in this Circuit to an exception that looks to other special circumstances that would make granting priority to the suit filed second more appropriate. See Factors Etc., Inc., 579 F.2d at 218. Further, motions for transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis. See Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 108 S.Ct. 2239, 2243, 101 L.Ed.2d 22 (1988).
 
 
 32
 Appellant suggests no inconvenience to the parties, nor any interests of justice that would impel the district court to take the extraordinary measures of severing the CERCLA claim from the bankruptcy claim and sending the cleanup cost recovery portion of the settlement to the Eastern District of Pennsylvania for approval. While the familiarity and expertise of the Pennsylvania court arguably might be indispensable were this case to concern remedial measures to take place at the site, the same cannot be said for a compromise as to the amount of money recovered for cleanup purposes, especially one, as here, against a non-party. Moreover, the strong bankruptcy code policy that favors centralized and efficient administration of all claims in the bankruptcy court, see In re Ionosphere Clubs, Inc., 922 F.2d 984, 989 (2d Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991); In re Manville Forest Prods. Corp., 896 F.2d 1384, 1391 (2d Cir.1990), outweighs any similar policy expression found under CERCLA.
 
 
 33
 Thus, we see no reason to disturb the exercise of the district court's discretion in refusing to transfer that portion of the settlement agreement compromising the CERCLA claim to the Eastern District of Pennsylvania.
 
 III Agreement
 
 34
 Publicker's remaining argument questions the approval of the settlement agreement on several substantive grounds. First, appellant asserts that the covenant not to sue is contrary to 42 U.S.C. § 9622(f) (1988), and that the provision releasing the bank and its receiver, the Resolution Trust Corporation, from natural resource damage liability violates § 9622(j). Second, Publicker contends the settlement is not fair, reasonable, or consistent with the goals of CERCLA since Freedom Savings and Resolution Trust should be jointly and severally liable for the site remediation costs.
 
 
 35
 With respect to the grounds first raised, Publicker has waived its opportunity to object. Both in its submission to the district court opposing the approval motion and in its reply papers, other than challenging the fairness and reasonableness of the settlement, appellant failed to raise any substantive objection to it. Although Publicker may have raised some of these arguments before the bankruptcy court, it joined in requesting that the approval motion be withdrawn from the bankruptcy court, and readily concedes the bankruptcy court's limited approval concerned only bankruptcy issues. Given the limited nature of the bankruptcy court's review and the full opportunity Publicker had to bring these objections to the district court's attention, we do not think it an injustice to refuse to review these issues on appeal. See Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); In re Grand Jury Proceedings (Kluger), 827 F.2d 868, 874 n. 4 (2d Cir.1987).
 
 
 36
 Turning to appellant's second contention, that the district court erred in finding the settlement fair, reasonable, and consistent with CERCLA's goals, we find the district court acted within its discretion. A district court reviewing CERCLA is required to rule on the fairness of any proposed settlement. See United States v. Cannons Eng'g, 899 F.2d 79, 84 (1st Cir.1990). Publicker insists that Freedom Bank should be held liable as an owner and/or operator of the site from February 13, 1987 until February 23, 1988, when it relinquished control of the property, and that the Resolution Trust Corporation should also be liable as the bank's successor. Essentially it declares the settlement is unfair and unreasonable because if it is found jointly and severally liable under CERCLA, Publicker will not be able to bring a contribution action under § 9613 against the bank or its receiver-successor. Cf. O'Neil v. Picillo, 883 F.2d 176, 178-79 (1st Cir.1989) (stressing that courts frequently hold responsible parties jointly and severally liable with little likelihood of contribution), cert. denied, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990).
 
 
 37
 We owe a twofold deference to the approved settlement. Appellate courts ordinarily defer to the agency's expertise and the voluntary agreement of the parties in proposing the settlement. See Chevron, U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984); Cannons, 899 F.2d at 84. Further deference is accorded by the reviewing court to the informed discretion of the trial court in approving the settlement. See United States v. Hooker Chems. & Plastics Corp., 776 F.2d 410, 411 (2d Cir.1985); United States v. AKZO Coatings of Am., Inc., 949 F.2d 1409, 1424 (6th Cir.1991). The usual deference given the EPA coupled with the abuse of discretion standard for reviewing the district court's action in approving a settlement precludes upsetting the appealed-from order unless Publicker is able to point to an error of judgment or law. Cf. AKZO, 949 F.2d at 1425-26 (applying arbitrary and capricious standard of review). Appellant has not made such a showing.
 
 
 38
 Considerable doubt is cast on Publicker's contention that Freedom Bank would be found liable as an owner or operator during its period of access to and control of the site in 1987 for several reasons. As an initial matter, the settlement's reopener provision minimizes any potential prejudice the settlement might have on Publicker. The agreement releases Freedom Bank from liability and provides for contribution protection based solely on the representations of fact made by the bank regarding its limited activity at the site. If the government discovers the bank's factual representations are false the covenant not to sue and the agreement's contribution protection provisions have no effect.
 
 
 39
 Moreover, and perhaps more significant in casting doubt, Freedom Savings may be exempt from CERCLA liability. While § 9607(a) imposes liability on certain owners and operators of facilities releasing hazardous substances, the Act exempts from the definition of owner or operator any "person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A) (1988). Although this safe harbor provision provides some protection to secured creditors, no judicial consensus clearly defining its scope has evolved. See In re Bergsoe Metal Corp., 910 F.2d 668, 672 (9th Cir.1990) (noting that at minimum some actual management of facility by creditor must take place before provision becomes inapplicable); United States v. Fleet Factors Corp., 901 F.2d 1550, 1557-58 (11th Cir.1990) (noting that a secured creditor may be liable under § 9607(a) "if its involvement with the management of the facility is sufficiently broad to support the inference that it could affect hazardous waste disposal decisions if it so chose"), cert. denied, --- U.S. ----, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991); United States v. Mirabile, [1985] 15 Envtl.L.Rep. (Envtl.L.Inst.) 20,994, 20,996 (E.D.Pa. Sept. 4, 1985) (attaching no liability when secured lender foreclosed on its collateral and merely took prudent measures to secure property against further depreciation). The EPA has suggested that permissible activities within § 9601(20)(A) include efforts by secured creditors to foreclose on the security, wind-up operations, liquidate or sell off assets, and "otherwise act to recover the value of the security interest in a manner consistent with good commercial practice." 56 Fed.Reg. 28,798, 28,800 (June 24, 1991).
 
 
 40
 Based on the bank's actions--as it represented them in the settlement--we think the probability that Freedom Savings or the Resolution Trust could be held liable under CERCLA remains sufficiently remote to inhibit us from holding the district court abused its discretion in approving the settlement. Freedom Savings assumed control of the dormant facility pursuant to court order and contracted for the salvage and sale of certain materials and equipment only after obtaining court approval and direction. At least under the EPA's suggested interpretation of the secured lender exemption, the bank's actions would not constitute management participation thereby triggering § 9607(a) liability.
 
 
 41
 Without expressly deciding whether such activities constitute management participation under § 9601(20)(A), we believe it unlikely enough as to demonstrate the reasonableness of the government's compromise of its claim. Given the risk of recovery, the settlement not only protects the public interest but is fair towards other potentially responsible parties like Publicker. In the event Publicker is found jointly and severally liable, it will be relieved of liability to the extent of the government's recovery under the settlement.
 
 
 42
 It also remains unlikely that both the government and Publicker would be able to recover from Freedom Savings due to that institution's limited assets following insolvency and receivership on October 13, 1989. Because liability has not yet been fixed in the EPA's cost recovery action filed in December, 1990 against Publicker in the Eastern District of Pennsylvania, the EPA and Publicker are not in a position to assert any "accrued and unconditionally fixed" claim against the bank or the Resolution Trust Corporation. Without an accrued and unconditionally fixed claim against the bank existing on or before its date of default, see 12 C.F.R. § 360.2(a)(7) (1992), and filed within 90 days with the Resolution Trust, see 12 U.S.C.A. § 1821(d)(5)(B) (1988), the government and Publicker may only recover if Freedom Savings' assets exceed all claims that were timely filed and fixed.
 
 
 43
 Despite Publicker's objections, the district court properly relied on the affidavit submitted by Resolution Trust stating that Freedom Savings will have insufficient funds to meet its obligations for accrued and unconditionally fixed claims, thus leaving contingent claims like those that the EPA and Publicker might make in the future totally unsatisfied. The possibility of the bank's insolvency before satisfying its fixed claims further indicates the fairness and reasonableness of the settlement.
 
 
 44
 Finally, the settlement fully comports with the two main objectives underlying CERCLA. Congress sought through CERCLA to encourage prompt and effective responses to hazardous waste releases and to impose liability on responsible parties, see Voluntary Purchasing Groups, Inc. v. Reilly, 889 F.2d 1380, 1386 (5th Cir.1989); Lone Pine Steering Comm. v. EPA, 777 F.2d 882, 886 (3d Cir.1985), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986), and also aimed to encourage settlements that would reduce the inefficient expenditure of public funds on lengthy litigation. See 42 U.S.C. § 9622(a) (Supp.1992); City of New York v. Exxon Corp., 697 F.Supp. 677, 693 (S.D.N.Y.1988). Inasmuch as the settlement agreement reduces the litigation surrounding the Publicker site cleanup and releases from liability those parties unlikely to bear responsibility for it, it furthered CERCLA's goals. The district court therefore acted within its discretion in approving the settlement agreement as fair, reasonable and consistent with CERCLA's objectives.
 
 CONCLUSION
 
 45
 Accordingly, the judgment of the district court is affirmed.